People v L.M. (2025 NY Slip Op 25079)

[*1]

People v L.M.

2025 NY Slip Op 25079

Decided on March 10, 2025

County Court, Columbia County

Howard, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on March 10, 2025
County Court, Columbia County

The People of the State of New York

against
L.M., Defendant.

Indictment No. 70163-24

WILLIAM J. GALVIN, ESQ.
P.O. Box 320
Ghent, New York 12075
Attorney for the Defendant
HONORABLE CHRIS LIBERATI-CONANT
Columbia County District Attorney
325 Columbia Street, Suite 260
Hudson, New York 12534
Attorney for the People
NO SUBMISSION
HONORABLE LETITIA JAMES
New York State Attorney General
The Capitol, Albany, New York 12224

Michael C. Howard, J.

The defendant, by motion dated November 15, 2024, moves for various forms of relief. The People oppose in an affirmation dated February 5, 2025. The Court will address the defendant's requests in the order of the notice of motion.
I. Inspection of Grand Jury Minutes and Dismissal of the Indictment.
Upon a review of the Grand Jury minutes, it appears there may have been some impropriety in the presentation of the charges. Therefore, this Court will issue herewith an order unsealing the entirety of the minutes for review by defense counsel. The Grand Jury minutes reveal questions by Grand Jurors that were not adequately responded to by one of the presentment agency's witnesses. Specifically, when asked by a member of the Grand Jury whether the decedent has been abusive to the defendant, a witness responded that there was no evidence of abuse. However, according to records subpoenaed by defense counsel, this witness [*2]had personal knowledge of allegations of abuse by the decedent toward the defendant.
The defense will have the opportunity, after review of the Grand Jury minutes to renew their argument concerning the legal sufficiency of the evidence before the Grand Jury.
II. Removal to Family Court on the Consent of the District Attorney
The prosecution declines to consent to removal of this matter to Family Court pursuant to Criminal Procedure Law § 722.22(b).
III. Constitutional Argument
The Court will address the defendant's motion to remove the charges to Family Court on constitutional equal protection grounds.
This brings in the whole question of how can you be logically consistent when you advocate obeying some laws and disobeying other laws. Well, I think one would have to see the whole meaning of this movement at this point by seeing that the students recognize that there are two types of laws. There are just laws and there are unjust laws. And they would be the first to say obey the just laws, they would be the first to say that men and women have a moral obligation to obey just and right laws. And they would go on to say that we must see that there are unjust laws. Now the question comes into being, what is the difference, and who determines the difference, what is the difference between a just and an unjust law? Martin Luther King, Jr. Love, Law and Civil Disobedience November 16, 1961, as reprinted in A Testament of Hope: The Essential Writings of Martin Luther King, Jr., Edited by James M. Washington (1986).
The defense of infancy is defined in Penal Law § 30.00. A fifteen year old child cannot be held criminally responsible for most crimes, as befits their immaturity and youth. An exception to this rule is carved out, making the same fifteen year old criminally responsible for murder, depraved indifference murder and first degree arson. (Penal Law §§ 30.30[2]; 125.25(1); 125.25(2); 150.20).
The New York State Legislature has determined that there should be an off ramp for children accused of criminal behavior. According to the New York State Raise the Age Implementation Task Force Final Report, "An important goal of Raise the Age was to provide more youth with the opportunity to be diverted from the youth justice system and have their case adjusted as part of the Family Court process." https://www.ny.gov/sites/default/files/atoms/files/FINAL_Report_Raise_the_Age_Task_Force_122220.pdf accessed on February 27, 2025, at page 12. "Young people who find themselves in the criminal courts are not comparable to adults in many respects—and our jurisprudence should reflect that fact." People v. Rudolph, 21 NY3d 497, 506, 997 N.E.2d 457, 462 (2013). 
The Raise the Age legislation was an attempt to restore proportionality to juvenile justice, following the harsh 1978 Juvenile Offender Act, which for the first time lowered the age of criminal responsibility to 13 years old. Sara V. Gomes, New York's Raise the Age Law: [*3]Restoring the Juvenile Justice System Leaves Courts Legislating from the Bench, 40 Pace L. Rev. 456, 462 (2020). The 1978 Juvenile Offender Act was an abject failure. That legislation "failed to deter juvenile crime, left all juveniles prosecuted as adults with stifling criminal records, and left those incarcerated with adults at risk for emotional and sexual abuse, and criminal socialization." Gomes, 2020 at 463. Also see Citizen's Committee for Children of New York, Inc. In Search of Juvenile Justice (1979).
The goal of the Raise the Age legislation was to improve public safety and outcomes for justice involved children, but the implementation has been sluggish at best. 
Daily choices by decision-makers in local government and the criminal legal system are ignoring the rule of law and effective public safety strategies, revealing a troubling disconnect between the promise of Raise the Age and its implementation. This disconnect manifests in the increasing reliance on juvenile incarceration - both in secure and non-secure facilities- the inconsistent granting of youthful offender status, and the chronic underfunding and defunding of community based alternatives. All of this deliberately undermines the law's intent, public and personal safety and the court's integrity, every day in courtrooms across the state. The consequences are profound. Dana Rachin, Courts Should Commit to the Principles of New York's Raise the Age Law NYLJ, March 5, 2025
To date, there is nearly one billion dollars sitting unused in state coffers to fund and implement Raise the Age legislation in New York State, money that could go towards assisting rehabilitative programs for youth. Jason Beeferman, The $980M collecting dust in Albany Politico, January 16, 2025. Without funding, options for justice-involved youth are limited, and opponents of Raise the Age can insinuate that this criminal justice reform measure is a failure. In contrast, "[s]even years of incarceration costs anywhere between $800,000 and $4 million, depending on the location within New York State." People v. Williams, 2025 NY Slip Op 00901, decided February 18, 2025 (Wilson, in dissent).
In 2012, The United States Supreme Court in Miller v. Alabama, laid out the factors that make children less culpable than adults. 
First, children have a 'lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking. Second, children are more vulnerable to negative influences and outside pressures, including from their family and peers; they have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings. And third, a child's character is not as "well formed" as an adult's; his traits are "less fixed" and his actions less likely to be "evidence of irretrievabl[e] deprav[ity]." Miller v. Alabama, 567 U.S. 460, 471, 132 S. Ct. 2455, 2464 (2012) (internal quotation marks and citations omitted).
More recently, the Supreme Court stated, with respect the court's consideration of the Miller factors: "[A] sentencer cannot avoid considering the defendant's youth if the sentencer has discretion to consider that mitigating factor." Jones v. Mississippi, 593 U.S. 98, 115, 141 S. Ct. [*4]1307, 1319—20 (2021). 
The brain of an adolescent [FN1]
is in flux. During adolescence into early adulthood, the portions of the brain responsible for information processing, otherwise known as "grey matter," undergo a process that scientists say create more efficient and higher-level cognition, known as "synaptic pruning." Meanwhile, connections within the brain called "myelinizations" between different areas of the brain continue to grow and develop until early adulthood. These connections facilitate executive functions, self control and emotional regulation. Until those connections are fully developed, children lack the level of foresight and self control typically found in adults. See Center for Law, Brain & Behavior at Massachusetts General Hospital White Paper on the Science of Late Adolescence: A Guide for Judges, Attorneys and Policy Makers (January 27th, 2022), at pages 48-50; Monahan, et al 2015 at 583. Adolescent's brains also undergo changes in the density and distribution of dopamine receptors, in the limbic system "where emotions are processed and rewards and punishments experienced." Monahan, et al 2015, at 582.
Adolescents also tend to exhibit less self control and reasoning ability when faced with emotional situations or situations in which they perceive a threat. This situational lack of self-control does not typically last through adulthood, but improves with time and brain development. Center for Law, Brain and Behavior, 2022 at pages 52-54. Monahan, et al 2015 at page 582.
Adolescents prioritize immediate outcomes over long term consequences. This means that adolescents will be more likely to comply when interacting with law enforcement, in an effort to escape an uncomfortable situation as soon as possible. This has implications for many decisions made by justice-involved children including improvident waiving of rights, making false confessions, and deciding to plead guilty. Center for Law, Brain and Behavior, 2022 at at page 28; Kathryn Monahan, Laurence Steinberg, and Alex R. Piquero, Juvenile Justice Policy and Practice: A Developmental Perspective, 44 Crime and Justice 1 A Review of Research (2015) at page 589. In a study of children offered a hypothetical plea bargain, the researchers found there was a "much stronger tendency for adolescents than for young adults to make choices in compliance with the perceived desires of authority figures." Laurence Steinberg Adolescent Development and Juvenile Justice 5 Annual Review of Clinical Psychology 47-73 at 64 (2009)
Adolescents also tend to desist from criminal conduct as they attain adulthood, given sufficient opportunities to engage in prosocial learning and adaptation. Center for Law, Brain and Behavior, (2022) at page 36. The commission of violent crime by an adolescent is not a good predictor of future criminal activity. Even adolescents convicted of homicide self-desist from further crime at the same rates as those convicted with less serious offenses. Center for Law, Brain and Behavior (2022) at page 38; Steinberg, Cauffman and Monahan Psychosocial Maturity and Desistance from Crime in a Sample of Serious Juvenile Offenders Office of [*5]Juvenile Justice and Delinquency Prevention, U.S. Department of Justice (2015) .
Adolescents who are subjected to the consequences of criminal justice involvement (i.e. a criminal record, prolonged incarceration, forced affiliation with adult criminals when aging out of the youth detention centers, and social labeling) have an increased risk of recidivism and criminal behaviors. Center for Law, Brain and Behavior (2022) at page 43. Thomas A. Loughran, Edward P. Mulvey, Carol A. Schubert & Jeffrey Fagan 2009 Estimating a Dose-Response Relationship between Length of Stay and Future Recidivism in Serious Juvenile Offenders 447 Criminology 699 at 729 (2009). This is not surprising, given the brain plasticity of youngsters, and the conditions of confinement in the New York State OCFS and DOCCS systems. Benjamin Weiser and Michael Schwirtz U.S. Inquiry Finds a 'Culture of Violence' Against Teenage Inmates at Rikers Island The New York Times (2014, August 4) . In 2011, the Annie E. Casey Foundation pointed out "In New York State, 89 percent of boys and 81 percent of girls released from state juvenile correction institutions in the early 1990s were arrested as adults by age 28." Annie E. Casey Foundation No Place for Kids (2011) at page 10. "Juvenile justice intervention was strongly predictive of adult crime, by almost a factor of seven, even after controlling for risk and protective variables collected during adolescence....Placement interventions increased the risk of adult crime by a factor of almost 38." Monahan, Steinberg and Piquero (2015) at 594. Youth who have been confined are observed to have developed addictions and mental health challenges which are rarely addressed upon their release which continues the cycle of arrest. Dana Rachin, Courts Should Commit to the Principles of New York's Raise the Age Law NYLJ, March 5, 2025
In the case of juvenile offenders charged with murder in the second degree, the district attorney's request or consent is required to remove the matter to Family Court. CPL §§ 722.20(4); 722.22(1)(b). In making such a determination, the Court must consider interest of justice factors, to wit:
(a) the seriousness and circumstances of the offense;
(b) the extent of harm caused by the offense;
(c) the evidence of guilt, whether admissible or inadmissible at trial;
(d) the history, character and condition of the defendant;
(e) the purpose and effect of imposing upon the defendant a sentence authorized for the offense;
(f) the impact of a removal of the case to the family court on the safety or welfare of the community;
(g) the impact of a removal of the case to the family court upon the confidence of the public in the criminal justice system;
(h) where the court deems it appropriate, the attitude of the complainant or victim with respect to the motion; and
(i) any other relevant fact indicating that a judgment of conviction in the criminal court would serve no useful purpose. See CPL 722.22(2).
In addition to the interest of justice factors above, removing a juvenile accused of murder and depraved indifference murder to Family Court requires the presence of one of the following elements:
"(i) mitigating circumstances that bear directly upon the manner in which the crime was committed; (ii) where the defendant was not the sole participant in the crime, the defendant's participation was relatively minor although not so minor as to constitute a defense to the prosecution; or (iii) possible deficiencies in the proof of the crime." See CPL 722.22(1)(b). Notably, the prosecution's consent is not needed to remove the charge of arson in the first degree to Family Court, despite the fact that the offense is also a class A-I felony. Penal Law §150.20. This distinction has no basis in science, as it implies that a child is somehow more culpable when he or she commits a more serious offense, such as homicide. 
There is no internal consistency or logic within the current legal framework vis a vis children charged with different levels of crime. The crime charged should have no bearing on the culpability of a child relative to an adult. If the defendant is fifteen years old, she is a child, not an adult. One can question whether she should bear adult responsibility. It appears the law does not provide equal protection for similarly situated 15 years old charged with a crime. This Court cannot adopt the legal fiction that the more severe a crime, the more culpability a fifteen year old child has. L.M. was a child at the time of the instant offense, and should be treated accordingly.
This Court may, on its own motion, conduct an analysis under CPL § 210.40(3) to determine whether a count of an indictment may be dismissed in the interest of justice. The analysis does not require the consent of the prosecution, and requires consideration of the interest of justice factors, which are essentially the same as the factors to be considered for removal of a youth part matter to Family Court. See CPL § 210.40(1)(a-j); CPL § 722.22(2)(a-i). The only factor that differs in the two statutes is consideration of any misconduct by law enforcement, which is present in interest of justice analysis, and absent in statute governing the removal of juvenile offenders to Family Court.
Based on the information available to the Court, the defendant's childhood has not been ideal. Defendant was placed in foster care as an infant, having been born "addicted to crack." Defendant had and has an IEP, a full scale IQ of 78, and was placed in a specialized classroom setting while at school. According to an evaluation by Dr. Jacqueline Bashkoff, submitted for the Court's review by the defense, defendant has lived an isolated and lonely life with her father. There were numerous "unfounded" child protective reports regarding her maltreatment by her father, including being called vile names, being made to steal, and being punched repeatedly in the head, where a bruise would not be obvious. In April of 2024, defendant arrived at school with bags of clothing and refused to get on the bus back home.[FN2]
Defendant told her school social [*6]worker of her desperation to get away from her father. Thereafter, in May of 2024, defendant was hospitalized at a psychiatric center after running away from home. She told the police that she would kill her father if he touched her again. Defendant was nonetheless discharged to her father on June 6, 2024, one day before the charges in the Indictment.Since her arrest and placement at [redacted], she has been diagnosed with ADHD and anxiety disorder.
While Article 722 of the Criminal Procedure Law does not give the authority to the Court to remove the matter to Family Court without the consent of the prosecutor (See Criminal Procedure Law §§ 722.20[4], 722.22[1][b]), this Court has the power to dismiss the matter outright in the interest of justice over the prosecutor's objection. While that would obviously be a drastic remedy, so too is the conviction of a child with murder, and imposing a sentence that must include a lifetime on parole. The framework of the law surrounding children charged with murder provides no other safety valve in recognition of the tender age of the defendant. Mitchell Krapes, When Youth Kill: Reconsidering Lengthy Sentences, NYLJ November 24, 2020; Also see People v. K.S., 84 Misc 3d 319 (Sup Ct. Richmond County 2024). Therefore, this Court will schedule a hearing to explore the interest of justice factors prior to accepting a plea.
IV. Disclosure of Exculpatory Evidence
The prosecution is directed to provide any and all evidence relevant to guilt or punishment in accordance with the constitutional directive of Brady v. Maryland, 373 U.S. 83 (1963) and its progeny; and in accordance with the statutory directive of Criminal Procedure Law Article 245.
V. Preclusion Unnoticed Statements
The defendant's motion to motion preclude statements not noticed by People pursuant to CPL § 710.30 is granted.
VI. Suppression of Statements Disclosed Pursuant to CPL 710.30
The Court will conduct a Huntley hearing (People v. Huntley, 15 NY2d 72 [1965]) to determine the admissibility at trial of defendant's statements to law enforcement. CPL §710.60(4). The Court notes the People's consent thereto.
VII. Sandoval / Ventimiglia / Molineaux
The Court will conduct a pretrial hearing in accordance with the authority of People v. Sandoval, 34 NY2d 371 (1974) to determine what, if any prior conviction the People can use to impeach the defendant's credibility. The Court believes no such history exists. 
The Court will also determine whether the People are permitted to submit proof of [*7]uncharged bad acts to the finder of fact on their direct case pursuant to People v. Molineaux, 168 NY 264 (1901). The People are directed to provide the defendant and the Court with a summary of any uncharged acts they plan to present on their direct case.
VIII. Audibility / Visibility Hearing
To the extent that it is applicable, the Court will hold a hearing to determine the audibility of any audio recording and visibility of any video recording.
IX. Scheduling
Court hearings will be scheduled in accordance with the Court's availability.
X. Renewal of Motions
The Court will determine whether further motions are appropriate and timely on a case by case basis.
Dated: March 10, 2025
Hudson, New York
ENTER:
Michael C. Howard, J.C.C.

Footnotes

Footnote 1:"Adolescent" when used by the White Paper on the Science of Late Adolescence contains a range of ages including individuals within the age range that can be charged as juvenile offenders. Also see Monahan, Steinberg and Piquero Juvenile Justice Policy and Practice: A Developmental Perspective 44 Crime and Justice No 1 pp 577-619 fn 2 (2015) "Developmental psychologists tend to recognize the period between 12 and 17 years as crucial."

Footnote 2:
 People, don't you understand
The child needs a helping hand
Or he'll grow to be an angry young man some day
Take a look at you and me
Are we too blind to see?
Do we simply turn our heads
And look the other way
Mac Davis In the Ghetto recorded by Elvis Presley on "From Elvis in Memphis" RCA Victor 1969